UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| RONALD HENDERSHOT, | § |
| | § |
| *Plaintiff,* | § |
| | §  Case No.: |
| V. | § |
| | § |
| MARATHON PETROLEUM CORPORATION, | § |
| | § |
| *Defendant.* | § |

**COMPLAINT WITH JURY DEMAND**

Plaintiff Ronald Hendershot ("Plaintiff" or "Hendershot") files this Complaint against Defendant Marathon Petroleum Corporation ("Defendant" or "Marathon"), and would show as follows:

**PARTIES**

1. Plaintiff Ronald Hendershot is an individual formerly employed by Defendant.

2. Defendant Marathon Petroleum Corporation is a publicly traded corporation that can be served through its registered agent for service of process, CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219.

**JURISDICTION AND VENUE**

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiff is bringing suit pursuant to 18 U.S.C. § 1514A, the Sarbanes-Oxley Act ("SOX").

4. Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and § 1391(b)(2) because Defendant's principal place of business is in this District and because a substantial part of the events or omissions giving rise to the claim occurred in the District.

## PROCEDURAL REQUISITES

5. All conditions precedent to filing this Complaint have been met.

6. Plaintiff timely filed a complaint with the Occupational Safety and Health Administration ("OSHA") on March 26, 2020.

7. The Secretary of Labor has not issued a final decision within 180 days of Plaintiff filing his complaint with OSHA. Plaintiff has not caused any delay.

8. Pursuant to 29 C.F.R. 1980.114, Plaintiff brings this lawsuit for de novo review in an appropriate district court of the United States, which has jurisdiction over the action without regard to the amount in controversy.

9. Pursuant to 29 C.F.R. 1980.114(c), within seven days after filing this Complaint, Plaintiff will file with the Administrative Law Judge a copy of this file-stamped Complaint, and Plaintiff will also serve this Complaint on the OSHA official who issued the findings and/or preliminary order, the Assistant Secretary, and the Associate Solicitor, Division of Fair Labor Standards, U.S. Department of Labor.

## FACTS

10. Plaintiff Ronald Douglas Hendershot was a long-time employee of Marathon in Canton, Ohio from 2007 to November 21, 2019.

11. Hendershot was originally hired as a rotating equipment engineer and was promoted to Machine Shop Supervisor in 2010. In 2014, he was promoted again to Reliability Supervisor. In 2017, he was promoted again to Craft Supervisor. In that role, Hendershot was responsible for managing the day-to-day maintenance and reliability of a 100,000 barrel-per-day refinery. He had direct oversight over 55 employees and indirect oversight of an additional 200 contractors. He was responsible for ensuring the highest safety standards while balancing the needs

and priorities of the business. Hendershot managed a routine maintenance operating budget of $36 million, requiring strong financial stewardship of capital expenditures.

12. Throughout Hendershot's tenure at Marathon, he was an excellent employee and received high performance ratings and met or exceeded all of his goals year after year. He regularly executed high dollar projects and his ratings have always reflected it. Marathon sent Hendershot to Europe to review equipment, and Hendershot went to the company's Flagship plant for 6 months to manage a turnaround for them.

13. During Hendershot's time as Craft Supervisor that is relevant to this complaint, he reported directly to Mark Estep, Maintenance Manager. Estep relocated to Marathon's Canton refinery in approximately March 2019. Estep reported directly to Plant Manager Don McCord. Mike Henschen served as Director of Refinery Maintenance for all the Marathon plants.

**A. Marathon and Andeavor Merged in 2018, Touting to Shareholders the Expected Synergies of the Merger.**

14. On May 25, 2018, Marathon and Andeavor sent a lengthy joint letter to stockholders of the two companies recommending a merger between the two companies and describing the history of the proposed merger.[1] For example, Marathon and Andeavor wrote:

> In March 2017, Mr. Gregory J. Goff, the Chairman, President and Chief Executive Officer of Andeavor, and Mr. Gary R. Heminger, the Chairman and Chief Executive Officer of MPC, met following an industry event and discussed various industry-related matters and, separately, the possibility of exploring a strategic transaction between the companies and ***the potential benefits of such a transaction given the similarity of the companies' business models, the diversity of the geographic regions of their business operations and the possibility of potentially significant synergies from a strategic combination.***
>
> . . .
>
> On April 10, 2018 and April 11, 2018, Messrs. Goff and Heminger met again to refresh the synergies assessment conducted in August 2017, with Andeavor executives, including Mr. Sterin, and MPC executives, including Mr. Griffith. ***The participants confirmed that a***

---

[1] Available at https://www.sec.gov/Archives/edgar/data/1510295/000119312518175608/d579253ds4.htm (last accessed October 27, 2020).

> ***strategic combination between Andeavor and MPC would likely result in more than $1 billion in annual synergies, which would be expected to be realized within the first three years after the combination***.

(emphasis added).

15. On October 1, 2018, following approval from both sets of shareholders, Marathon and Andeavor closed on their merger. "This transformative transaction is a significant milestone in our company's more than 130-year history," said Marathon Chairman and CEO Gary R. Heminger. "MPC is now the leading refining, midstream, and marketing company in the U.S., and is well-positioned for long-term growth and shareholder value creation." Heminger claimed, "***We are excited to begin unlocking the extraordinary potential across our new platform, including approximately $1 billion of tangible annual run-rate synergies we expect within the first three years***." (emphasis added).

16. Following the merger, Marathon emphasized to the investment community that it was on track to meet and even exceed its synergies goals. On a fourth quarter 2018 earnings call, Marathon claimed that of the $160 million of synergies realized in the fourth quarter of 2018, $138 million were in Marathon's refining and marketing segment.[2] "Although not all of these synergies are recurring, it has underscored our confidence in delivering on the significant opportunities that are available to us," said Don Templin, president of refining, marketing and supply.

17. On December 4, 2018, just two months after the company took over Andeavor, Marathon increased its targeted annual run-rate synergies by 40%, to $1.4 billion by October 2021. That same day, Mr. Heminger himself informed shareholders, "the synergy numbers we gave you, we delivered, and we outperformed. We don't give you a number unless we know we can

---

[2] Available at https://csnews.com/synergies-marathon-petroleum-andeavor-merger-target (last accessed October 27, 2020).

outperform that number."[3]

18. Marathon again touted its successful realized synergies of $133 million in the first quarter of 2019.[4] Marathon emphasized to its shareholders, "MPC realized $133 million of synergies related to the Andeavor combination in the first quarter. The company continues to expect annual gross run-rate synergies of up to $600 million at year-end 2019 and $1.4 billion by the end of 2021." The company also explained that $89 million in synergies came from refining and marketing.

19. For the second quarter 2019, the company announced: "MPC realized $270 million of synergies in the second quarter. Some examples of realized synergies include: approximately $60 million of turnaround savings related to lower spending and incremental earnings from completing maintenance under budget and ahead of schedule . . . ."[5] "Our team's impressive execution this quarter led to strong realized synergies," said Heminger. "Combined with our first quarter results, we have realized $403 million of synergies year to date. Our progress gives us great confidence in achieving our target of up to $600 million of annual gross run-rate synergies by year-end 2019 and $1.4 billion by the end of 2021."

20. Notwithstanding Marathon's glowing self-reviews, by the fall of 2019, it was widely reported that the merger between Marathon and Andeavor had failed to live up to market expectations. Consequently, Marathon's shares plummeted to a two-year low over the summer of 2019, and in October the company announced that Heminger would retire in April 2020, possibly as a result of shareholder resentment.

---

[3] Available at https://www.spglobal.com/marketintelligence/en/news-insights/trending/v-eyvyrgsqu8kwlnkwufyq2 (last accessed October 27, 2020).
[4] Available at https://www.sec.gov/Archives/edgar/data/1510295/000151029519000038/mpcq12019earningsrelease.htm (last accessed October 27, 2020).
[5] Available at https://www.sec.gov/Archives/edgar/data/1510295/000151029519000094/mpcq22019earningsrelease.htm (last accessed October 27, 2020).

21. Rather than admitting the truth of the shareholders' concerns, Mr. Heminger doubled down on his claims of synergies, asserting that Marathon was "well on track to achieve our target of up to $600 million of annual gross run-rate synergies by year-end 2019, and $1.4 billion by the end of 2021."[6]

22. Despite the overall disappointing results of the merger with Andeavor, Marathon continued to allege that the synergies realized in the merger with Andeavor have exceeded expectations until Marathon received service of Plaintiff's OSHA Complaint, which was mailed on or about April 3, 2020. For example, in a January 2020 press release announcing 2019 annual and fourth quarter results, Marathon reported, "***The company realized $1.1 billion of total synergies in 2019, exceeding the targeted $600 million of annual gross run-rate synergies***. ***The majority of the synergy capture for the year related to operational and commercial performance in the Refining and Marketing segment***, including: $128 million in catalyst formulation enhancements at seven refineries, $76 million in turnaround execution improvements at the Los Angeles, Martinez, and St. Paul Park refineries, $127 million in crude supply optimization in the Mid-Continent region, and $25 million in improved crude sourcing for the West Coast refineries."

23. On the January 2020 earnings call, Mr. Heminger continued to tout synergies to investors: "Our team's execution this quarter continued the trend of a very impressive synergy capture. . . . We believe MPC will build upon this platform and continue to capture substantial incremental value in 2020 and beyond."[7]

24. By the time the first quarter 2020 earnings call took place in May 2020, however, Marathon had received notice of Hendershot's OSHA complaint, which was filed in late March

---

[6] Available at https://www.sec.gov/Archives/edgar/data/1510295/000151029519000126/defa14a9272019.htm (last accessed October 27, 2020).
[7] Available at https://www.fool.com/earnings/call-transcripts/2020/01/29/marathon-petroleum-corporation-mpc-q4-2019-earning.aspx (last accessed October 27, 2020).

2020 and received by Marathon in early April 2020. Overnight, the claimed synergies disappeared completely from Marathon's earning calls with investors. Synergies were not mentioned a single time in the first quarter 2020 call in May 2020. Similarly, Marathon employees did not discuss synergies once during the second quarter 2020 call, even when asked about synergies by an investor in another context. Well before the end of 2021, Marathon appears to have completely abandoned its promise to investors to create over a billion dollars of synergies from the Andeavor merger. If Marathon truly believed its representations to shareholders were defensible and accurate, Marathon would not have abandoned its synergy claims immediately after learning of Hendershot's OSHA filing.

**B.     Hendershot Had Concerns that Marathon's Representations to Shareholders Concerning Synergies Realized By the Merger Were False.**

25.     Mike Henschen, Director of Refinery Maintenance, was responsible for the turnaround of the Canton plant and other Marathon plants following the merger of Marathon and Andeavor.

26.     A turnaround is a refinery event where production equipment is shut down to perform regulatory or integrity-driven inspections to assess their condition, test the operation of safety and critical equipment, and make repairs to equipment known in advance or discovered in the turnaround process. A turnaround also replaces catalyst when its useful life ends, cleans equipment to improve performance and efficiency, and makes upgrades to equipment to either improve performance, increase capacity, extend its run-life or meet regulatory requirements.

27.     When Maintenance Manager Mark Estep relocated to the Canton refinery in March 2019, Hendershot started to notice financial irregularities within the maintenance department. For example, Mr. Estep added his wife to contractor payrolls APS and Starcon, and when Hendershot reported it to Accounting they told Hendershot that was not supposed to know about it. Estep also

had contractors work on personal projects at his house or the houses of his friends. The Accounting budget soon included several pet projects of Estep, including $400,000 to a company of which his son is a vice president. Past maintenance managers had refused to fund at least some of these projects. For these reasons, Hendershot started paying more attention to Estep's budget activities.

28. On or about July 11, 2019, Hendershot notified Estep that Hendershot was concerned that Estep was transferring other department money and into the Maintenance budget, without reporting it to Findlay for approval, to pay for unapproved projects. Estep told Hendershot, "You know what I'm trying to do here." Based on Hendershot's observations, Hendershot believed that Estep was trying to use Marathon money to help his family and friends, as well as make it look like Marathon's merger with Andeavor was more successful than it was, at least in part to benefit himself financially.

29. Plant Manager McCord, Maintenance Manager Estep, and Accounting Manager Jim Juaquin receive separate bonuses based strictly on synergies that were created and realized at the Canton plant. At one time during 2019, Hendershot was on a conference call during which Director of Refinery Maintenance Mike Henschen pressured maintenance managers across the company to create potential synergies. Henschen also reminded the managers of the bonus program. Hendershot heard Henschen personally tell these managers to turn everything they could in and "let Findlay figure it out."[8] From this comment, Hendershot understood that Henschen was asking managers to classify as many things as possible as a synergy and submit everything to corporate, to make it look like there were more synergies than were actually being realized.

30. In the Canton plant, Marathon had an 8:30 operations meeting every morning. In general, members of the Refinery Leadership Team ("RLT") were present, including McCord,

---

[8] Findlay is the term many Marathon employees use to reference company headquarters.

Estep, Operations Manager Jeff Zuech, Hess Manager Darin Barber, HR Manager Jamie Mandeville, Engineering Manager Craig Schiro, Accounting Manager Jim Juaquin, Tech Service Manager Bev Long, Purchasing Manager Jim Spears, and Product Control Manager Shawn Adkins. In addition to the RLT, other supervisors were regularly present including Hendershot, Planning Supervisor Chris Cantrell, Product Movement Team Leader Gary Thaker, South Area Team Leader Justin Mills, North Area Team Leader Chad Veenstra, and Lab Supervisor Keith Thomas.

31. Throughout the end of 2018 and 2019, McCord applied consistent pressure during these Operations Meetings to come up with synergies. Like Henschen, Hendershot heard McCord regularly tell employees to "come up with any" synergies and "let Findlay sort it out." For example, employees in the meeting suggested taking credit for operators opening valves in process units that should have been open under normal operations. As a second example, employees suggested that a cleaning synergy could be credited for heat exchangers that were normal maintenance and had nothing to do with any synergies related to the purchase of Andeavor. Fouling of exchanges and cleaning them is a normal course of action and how any continuous hydrocarbon processing unit operate. In sum, nothing was off the table during these meetings. McCord encouraged changing deadlines and definitions of synergies to overstate the synergies that the turnaround was actually creating.

32. Mike Fannin, who was responsible for cost control of Canton's refinery turnaround but to the best of Hendershot's knowledge has no education or training in accounting practices, was promoted to work directly under Mike Henschen during this time period. Hendershot observed Fannin creating new bogus work orders against different budgets for work that was completed in 2018. This had the effect of shifting moneys to keep the Canton turnaround from going over

budget.

33. Around the Canton plant, supervisors and managers including Hendershot regularly called the above examples "Mike Henschen Math." To Hendershot, this referred to Henschen's regular practice of using financial numbers in creative ways to make his turnarounds appear more profitable than they were. He was widely regarded as planning the turnaround work "fat," which means that he put so much money and time in the initial budget that there was essentially no way to fail. For example, the Canton plant had a small pit stop DHT catalyst changeout budgeted, and the plant came in several million dollars under budget. Marathon employees called this a great success and synergy, but operators did not open the discharge valves on startup of the hydrogen compressors, with potentially fatal consequences. This cost $600,000 to repair, as well as a week over the proposed timeline, but this waste of time and money was never reported as an offset when calculating synergies.

34. Over the summer of 2019, Hendershot began regularly expressing his concerns during the 7:30 staff meetings and 8:30 Operations Meetings that Marathon was misallocating major budget items to make the turnaround appear more successful than it was. Overall, Hendershot was concerned that Estep, McCord, and Juaquin were including turnaround costs in the maintenance budget to make the turnaround appear more profitable. They were also leaving certain turnaround costs off the books so that Marathon would not go over its turnaround budget. Again, Estep, McCord, and Juaquin's bonuses were directly tied to the success of the turnaround and its promised synergies.

35. On or about October 1, 2019, during the Operations Meeting, management was discussing how to address $250,000 in machine parts that had been on the books since the turnaround. This money should have been on the 2018 books but Canton management had decided

to leave it off the budget to avoid exceeding the turnaround budget. The amount was carried over to the 2019 budget when maintenance revenues were misreported as turnaround dollars to make the turnaround appear more successful. During the meeting, Heather Pennington (who was filling in for Juaquin while he was covering other plants) suggested throwing away all $250,000 of brand new materials just to get them off the budget. Hendershot stated something like, "Enough is enough, this is a Sarbanes Oxley violation and I am reporting it and I refuse to allow this to proceed." Hendershot believed that Findlay and Marathon investors needed to know that this was happening regularly. Marathon was telling the market that it was hitting its turnaround budget but the company not; instead, Marathon was just passing it off to the next year and the excess money should have been returned to Findlay.

36. Leadership in the meeting appeared very angry at Hendershot for pushing back on their so-called "Mike Henschen math." The meeting ended very uncomfortably.

37. Within several days, Hendershot called and emailed Marathon's integrity department and the local cost control department within the maintenance department to report his concerns shifting costs from the turnaround budget to the maintenance budget, including but not limited to scrapping $250,000 in brand new equipment to avoid them appearing on the books, violated Marathon's obligations to shareholders.

**C. Immediately After Hendershot Reported Financial Irregularities, He Was Investigated and Terminated for a Pretextual Reason.**

38. On October 7, 2019, mere days after Hendershot accused Canton management of creating a Sarbanes Oxley violation, Hendershot received a vague meeting notice for a discussion with the Accounting Manager, the Global Procurement Manager, and the Maintenance Manager for October 14, 2019. On that day, Hendershot met with them about scrap equipment that had been disposed of the previous spring.

39. It quickly became apparent to Hendershot that, although he had followed all the proper protocols in disposing of the equipment and had written approval to do so from all appropriate individuals, Marathon was looking for any reason to investigate and terminate Hendershot.

40. In early April 2019, Hendershot had been asked to dispose of junk equipment. In fact, disposing of the equipment was in the performance goals because it had been sitting around so long it was becoming a safety hazard. Some of the equipment had even been implicated in an OSHA investigation because it had been left in service so long it became unsafe.

41. It looked like this:



42. Hendershot followed all proper procedures and received all proper approvals for disposing of this scrap equipment, including specific written approval from McCord:



43. Critically, Jim Juaquin and Don McCord were fully aware that Hendershot had all proper authority and permission to dispose of the junk equipment. On the day that the equipment was scheduled to leave the refinery, Hendershot remembers them mocking the inappropriate accounting practices that took place in the Robinson Refinery, which scraped a fire truck valued at $400,000 to avoid it appearing on the books. Juaquin and McCord joked that this situation was completely different than the Robinson situation because they were getting rid of equipment that had no value.

44. Nevertheless, Marathon accused Hendershot of embezzling money from the company. Hendershot followed Marathon's policy and his supervisors' instructions during this entire process, and Hendershot never profited (financially or otherwise) from scrapping these materials.

45. Hendershot's supervisors originally were prepared to clear Hendershot because

they concluded there was no "will [sic] intent or unethical issues." Estep in particular noted, "we as Marathon do not have a policy or procedure to follow in order to deal with getting rid of equipment, that's why I think [Hendershot] took it upon himself and done [sic] what he thought was best for the Company."

46. However, Heather Pennington—the very individual who Hendershot had accused of violating Sarbanes Oxley only days before—stepped in to make false accusations against Hendershot. On information and belief, Pennington also convinced two "anonymous" sources who are close personal friends of hers to make additional false complaints against Hendershot. Following these additional complaints, Marathon claimed that the investigation had been "incorrectly" assigned to the Canton plant and that it would be transferred to Internal Audit. In other words, although Canton leadership was on the verge of clearing Hendershot because they concluded he had not done anything wrong, Pennington—the very individual Hendershot accused of Sarbanes Oxley violations—stepped in with additional false complaints.

47. After Marathon's Internal Audit unit took over the investigation, Marathon terminated Hendershot on November 21, 2019.

48. Hendershot's termination was in retaliation for bringing concerns about shareholder fraud to the attention of Don McCord, Mark Estep, Heather Pennington, the Marathon integrity department, and other individuals with supervisory authority over Hendershot in violation of the whistleblower protections of the Sarbanes-Oxley Act. Marathon's investigation and eventually termination of Hendershot's for alleged embezzlement were all pretext for this retaliation.

## CAUSE OF ACTION
## 18 U.S.C. § 1514A(a)(1)(C):
## Retaliation Under the Sarbanes-Oxley Act ("SOX Retaliation")

49. Hendershot incorporates by reference all of the allegations made in the preceding paragraphs.

50. Hendershot engaged in activity protected by law. Specifically, he complained to supervisors regarding conduct that he reasonably believed (a) constituted securities and commodities fraud (18 U.S.C. § 1348); (b) violated rules and regulations of the Securities and Exchange Commission; and (c) violated federal law relating to fraud against shareholders.

51. Hendershot's complaints were made in good faith.

52. Hendershot reasonably believed that Marathon was acting with a mental state embracing intent to deceive, manipulate, or defraud its shareholders.

53. Marathon knew or suspected that Hendershot engaged in the protected activity.

54. Hendershot suffered adverse actions, including being terminated.

55. Hendershot's protected activity was a contributing factor in the adverse actions.

## ATTORNEYS FEES AND COSTS

56. Hendershot is entitled to special damages sustained as a result of the discrimination alleged herein, including litigation costs, expert witness fees, and reasonable attorney fees under 18 U.S.C. § 1514A.

## JURY DEMAND

57. Hendershot demands a trial by jury.

## DAMAGES

58. As a direct and proximate result of Marathon's actions, Hendershot suffered injuries and damages and seeks the following:

a. back pay, with interest;

b. equitable relief, including but not limited to front pay, retirement benefits, pension, and mental anguish compensation;

c. reinstatement with the same seniority status that Hendershot would have had, but for the discrimination;

d. pre-judgment and post-judgment interest as provided by law;

e. punitive damages;

f. all costs of court; and

g. any other relief to which Hendershot may be entitled, whether in law or equity, including all relief necessary to make Hendershot whole.

## PRAYER

59. For these reasons, Hendershot asks for judgment against Marathon for the following:

a. back pay, with interest;

b. equitable relief, including but not limited to front pay and mental anguish compensation;

c. reinstatement with the same seniority status that Hendershot would have had, but for the discrimination;

d. pre-judgment and post-judgment interest as provided by law;

e. punitive dmaages;

f. reasonable attorney's fees;

g. all costs of court; and

h. any other relief to which Hendershot may be entitled, whether in law or equity, including all relief necessary to make Hendershot whole.

Respectfully submitted,

/s/ Scott J. Stitt
Scott J. Stitt
Ohio State Bar No. 0073943
scott.stitt@tuckerellis.com
TUCKER ELLIS LLP
175 South Third Street, Suite 520
Columbus, OH 43215
614.358.9304
614.358.9712 (fax)

Lawrence Morales II (Pro Hac Vice Forthcoming)
ATTORNEY-IN-CHARGE
Texas Bar No. 24051077
Allison Sarah Hartry (Pro Hac Vice Forthcoming)
Texas Bar No. 24083149
**THE MORALES FIRM, P.C.**
6243 IH 10 West, Suite 132
San Antonio, Texas 78201
Telephone No. (210) 225-0811
Facsimile No. (210) 225-0821
lawrence@themoralesfirm.com
ahartry@themoralesfirm.com

***ATTORNEYS FOR PLAINTIFF***